ANTHONY S. FICHERA ET AL. *v.* MINE HILL
CORPORATION ET AL.
(13292)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued February 3—decision released April 26, 1988

*Sharon Wicks Dornfeld,* for the appellants (defendants).

*Roberta Napolitano,* for the appellees (plaintiffs).

SHEA, J. In this action for damages and other relief based upon the false representations of the defendants, who had formed a joint venture for the development of a recreational real estate subdivision, Hon. Milton J. Herman, a state trial referee acting as the trial court, rendered judgment for the plaintiffs to recover damages of $28,000 and an attorney's fee of $10,000 on the count of the complaint alleging a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. (CUPTA). The court did not resolve the two remaining counts alleging fraudulent misrepresentations and breach of contract. In their appeal from the judgment, the defendants claim that the court erred (1) in failing to sustain their special defense that the three year CUTPA statute of limitations, General Statutes § 42-110g (f),[1] barred the count on which the judgment had been rendered; and (2) in assessing damages by using an inappropriate methodology and by relying upon insubstantial evidence. We agree with the defendants that the court erred in failing to conclude

---

[1] General Statutes § 42-110g (f) provides: "An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."

that § 42-110g (f) precluded the CUTPA count. Accordingly, we do not address the issues relating to damages but remand the case for further proceedings.

The facts essential to the disposition of the appeal are undisputed. In February, 1979, the defendants, Mine Hill Corporation and Danbury Savings and Loan Association, formed a joint venture for the purpose of developing a real estate subdivision known as Scatacook Shores on the Shepaug River in the town of Southbury. The plaintiffs, Anthony and Gladys Fichera, had visited this development in August, 1978, before formation of the joint venture, in response to an advertisement placed in a Bridgeport newspaper by a real estate agent acting on behalf of the defendants. This advertisement offered lots for sale at a "Super Executive area in Southbury" as a private recreational development with "5 private acres of waterfront reserved for your fishing, swimming and boating needs." A sign, which the plaintiffs had observed when they visited the property in 1978, indicated, in addition to the items mentioned in the newspaper advertisement, that the development would include such features as a recreation area, beach, boat ramp, and community building with dining facilities. The defendants' sales agents represented to the plaintiffs that a marina, club house, parking area, and town approved road would also be constructed. A brochure given to the plaintiffs contained representations similar to those in the newspaper advertisement and those made by the defendants' sales agents.

On May 29, 1979, the plaintiffs purchased four lots at Scatacook Shores from the defendants for $168,000. The plaintiff Anthony Fichera testified that at the closing of title the defendants' attorney had represented that all of the recreational facilities would be completed by May, 1980. He testified also that at some time after that date, through his attorney, he had attempted

unsuccessfully to contact the defendants regarding the promised improvements. It was not until a short while after June 16, 1981, however, that he learned, from a letter written by the attorneys then representing the defendants to the Southbury planning commission, that the defendants did not intend to construct the community recreation center for which they had obtained a special exception in 1974. In this letter the defendants maintained that the community center was "a separate and distinct project to be undertaken by the homeowners' association if they decide to do it." The trial court found that, until the plaintiffs became aware of this letter, they had no "firm indication that the improvements would not be made."

In rendering judgment for the plaintiffs on the CUTPA count, the court found that the defendants had never intended to build "all of the things contained in the brochure" that had been given to the plaintiffs before they made their purchase, but had "never notified purchasers of lots that the defendants did not intend to complete the development as represented." Finding also a public nexus based upon the distribution of the brochure to the public and the advertisement in a newspaper,[2] the court concluded that this conduct was a violation of § 42-110b (a) of CUTPA

[2] In *Ivey, Barnum & O'Mara* v. *Indian Harbor Properties, Inc.*, 190 Conn. 528, 540, 461 A.2d 1369 (1983), this court held that, because of the directive in General Statutes § 42-110b that interpretations of the Federal Trade Commission Act be looked to as a guide for CUTPA determinations, "allegedly deceptive acts or practices which arise out of a private controversy are actionable only if the acts or practices have a potential effect on the general consuming public," as the federal courts have declared. See *Sportsmen's Boating Corporation* v. *Hensley,* 192 Conn. 747, 755, 474 A.2d 780 (1984). This public interest requirement for a private action under CUTPA was eliminated by an amendment to General Statutes § 42-110g (a) that became effective on June 8, 1984. Public Acts 1984, No. 84-468, § 2. The amendment does not affect this case, which was pending on its effective date.

"because it offends public policy and has caused substantial injury to the plaintiffs."

The only ground upon which the defendants now contend that the judgment of the trial court should be reversed is the failure to sustain their special defense that the CUTPA cause of action is barred by § 42-110g (f), which provides that an action for damages suffered by a person from a prohibited practice "may not be brought more than three years after the occurrence of a violation of this chapter." This suit was commenced on January 23, 1984, when the defendants were served, a date more than three years after May 29, 1979, when the plaintiffs had purchased their lots in reliance upon the defendants' misrepresentations as found by the trial court.

In rejecting the statute of limitations defense, the court relied upon a statement in *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957), that "[w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." See *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 241, 429 A.2d 486 (1980). The court concluded that, although the misrepresentations by the defendants had been made in 1978 and 1979, their "course of conduct was not completed until [June] 16, 1981,"[3] when, through their attorneys, they notified the Southbury planning commission that they did not intend to build the community recreation center. Accordingly, the court held that "[s]ince the plaintiffs brought this action in January of 1984, the statute of limitations is not a bar to this action."

---

[3] The memorandum of decision erroneously refers to July 16, 1981, as the date on which the plaintiffs learned that the promised recreational facilities would not be built by the defendants. The testimony of the plaintiff Anthony Fichera was, however, that he read the letter to the Southbury planning commission soon after its date, June 16, 1981. Accordingly, we

I

To support a finding of a "continuing course of conduct" that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. In *Bartha* v. *Waterbury House Wrecking Co.,* 190 Conn. 8, 13, 459 A.2d 115 (1983), we held that the alleged negligence of a contractor in failing to safeguard a dangerous hole left on the job site after it had completed its work "would not in itself establish that it had a continuing duty to warn of the danger or to safeguard the hole." We affirmed the summary judgment granted by the trial court in that case because the plaintiff had presented no facts, by affidavit or otherwise, that would reasonably have supported an inference that the duty to protect against the hazard left upon the premises extended for any substantial period beyond the time of the contractor's departure from the site. Similarly, in *Prokolkin* v. *General Motors Corporation,* 170 Conn. 289, 301, 365 A.2d 1180 (1976), we held that the concept of a continuing "duty to warn" of a defect as a basis for a claim of negligence that would toll the statute of limitations was inapplicable to a products liability action claiming strict liability for the sale of a defective product, where the statute runs from the date of sale, "the act or omission complained of." General Statutes § 52-577.

have used June 16, 1981, as the date of discovery of the existence of the CUTPA cause of action, as the plaintiffs have done in their briefs, instead of July 16, 1981, as the memorandum of decision states. This discrepancy of one month is without significance in the determination of the issues in this case. It should be noted, however, that the plaintiffs discovered the June 16, 1981 letter within three years following their purchase of the lots from the defendants on May 29, 1979, and had approximately eleven months remaining for commencement of an action within the period allowed by General Statutes § 42-110g (f).

Where we have upheld a finding that a duty continued to exist after the cessation of the "act or omission" relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. See *Giglio* v. *Connecticut Light & Power Co.*, supra, 242 ("repeated instructions and advice given to the plaintiff by the defendant" concerning a furnace it had previously converted and left in a defective condition); *Giambozi* v. *Peters,* 127 Conn. 380, 385, 16 A.2d 833 (1940) ("[w]hen . . . injurious consequences arise from a course of treatment [by a physician], the statute does not begin to run until the treatment is terminated"); cf. *Handler* v. *Remington Arms Co.,* supra (duty to warn of danger of defective cartridge, "an inherently dangerous article," held to continue in existence until time of injury).

The plaintiffs do not claim any relationship with the defendants that would create a duty continuing after the purchase of the lots other than that based upon the unfulfilled promises to construct various improvements upon the land of the defendants reserved as a recreational area. Such a contractual relationship, however, does not create a fiduciary obligation that might have imposed upon the defendants as the perpetrators of a fraud the continuing duty to disclose their prior lack of candor to the plaintiffs. Nor does the circumstance that the plaintiffs were the victims of deception, as the trial court found, impose such a duty of disclosure on the defendants. We are aware of no authority holding that the perpetrator of a fraud involving merely a vendor-vendee relationship has a legal duty to disclose his deceit after its occurence and that the breach of that duty will toll the statute of limitations. Such a relationship does not give rise to obligations equivalent to those of a fiduciary.

The only subsequent acts of the defendants claimed to be related to the misrepresentations that ceased after the plaintiffs had bought their lots are (1) the continued maintenance of a sign at the entrance of the development advertising "Scatacook Shores" as a "waterfront community," and (2) the disclosure to the Southbury planning commission by letter of June 16, 1981, that the defendants did not intend to build the proposed community recreation center, but that such a project might be "undertaken by the homeowners' association if they decide to do it." The plaintiffs do not claim that the sign in its present form constitutes a misrepresentation or that they in any manner have been misled by its designation of the area as a "waterfront community." Thus, the sign cannot be regarded as a continuing representation that the defendants would construct any of the recreational facilities that had been indicated by the brochure given to the plaintiffs or promised by the agents of the defendants prior to the purchase of the lots.

The trial court did not find anything wrongful about the June 16, 1981 letter of the defendants, although their disclaimer of any responsibility for building the community center appears to have been contrary to the representations found to have been made by the defendants' agents that a marina, club house and parking area "were to be constructed." The court based its finding of a violation of CUTPA wholly upon the representations made by the defendants when they had not intended to fulfill some of them and had failed to inform the purchasers of the lots that the defendants "did not intend to complete the development as represented." The court regarded as the CUTPA violation, not the disclaimer contained in the letter, but the failure to have informed the plaintiffs and other lot owners before June 16, 1981, of this change in plans. Thus the letter was held to warrant a conclusion that the defendants'

course of conduct was not completed until June 16, 1981, because the plaintiffs had not previously "received any firm indication that the improvements would not be made."

Unlike the statutes of limitation of some other states applicable to unfair trade practices legislation analogous to our CUTPA, which expressly allow a certain period following the discovery of the deceptive practice for commencing suit; e.g., N.C. Gen. Stat. § 1-52 (9) ("the cause of action [for fraud or mistake] shall not be deemed to have accrued until the discovery by the aggrieved party of the facts . . . .")—applicable to unfair trade practice limitation (N.C. Gen. Stat. § 75-16.2) of four years from accrual of cause of action; *Jennings* v. *Lindsey,* 69 N.C. App. 710, 318 S.E.2d 318 (1984); Tex. Business and Commerce Code Annot. § 17.565 (Vernon) ("within two years after the date on which the . . . deceptive act or practice occurred or within two years after the consumer discovered or . . . should have discovered the occurrence . . . "); § 42-110g (f) provides only that an action must be brought within three years "after the occurrence of a violation of this chapter." In construing our general tort statute of limitations, General Statutes § 52-577, which allows an action to be brought within three years "from the date of the act or omission complained of," we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred. *Prokolkin* v. *General Motors Corporation,* supra, 294–97. We have reached a similar conclusion in respect to the use of "act or omission complained of" in our personal injury statute of limitations, General Statutes § 52-584, prior to its amendment in 1969 to provide an alternative date for commencement of the limitation period, "two years from the date when the injury is first sustained or dis-

covered or in the exercise of reasonable care should have been discovered." Public Acts 1969, No. 401, § 2. We have held, prior to the amendment, that even where the wrongful act could not reasonably have been discovered until after the statute had run, any action seeking damages for such an "act or omission" was barred. *Kennedy* v. *Johns-Manville Sales Corporation,* 135 Conn. 176, 179–80, 62 A.2d 771 (1948).

We are unable to perceive any significant distinction applicable to this case between the "act or omission" reference, denoting the start of the limitation period in §§ 52-577 and 52-584, and the "occurrence of a violation" phrase in § 42-110g (f), setting the time when the three year period begins for bringing an action alleging a CUTPA violation. Neither the trial court nor the plaintiffs have suggested that this difference in statutory text is of any consequence under the circumstances of this case. The only violations of CUTPA alleged in the complaint are the false representations made by the defendants and their agents prior to the plaintiffs' purchase of their property in 1979. The complaint does not mention the letter of June 16, 1981, nor does it refer specifically to any other action of the defendants occurring after the purchase as a CUTPA violation. The court erred, therefore, in concluding that the statute of limitations had been tolled until June 16, 1981.

II

In their reply to the special defense that the CUTPA count of the complaint was barred by § 42-110g (f), the plaintiffs pleaded facts purporting to show that the defendants had fraudulently concealed from them the existence of their CUTPA cause of action and thus invoked the benefit of General Statutes § 52-595. That statute provides that where fraudulent concealment occurs, "such cause of action shall be deemed to

accrue . . . at the time when the person entitled to sue thereon first discovers its existence." The plaintiffs alleged in their reply that the "defendants knew, or should have known, that their continuous series of promises to construct the marina and boating and recreational facilities fraudulently concealed from the plaintiffs the knowledge that they had a cause of action against the defendants"; "that said misrepresentations prevented the plaintiffs from bringing suit"; that the defendants "continued to make said misrepresentations with the intention of preventing the plaintiffs from bringing suit"; and that, "relying on said misrepresentations, the plaintiffs failed to bring suit."

As we have noted previously, the only evidence of any affirmative conduct of the defendants that occurred after the misrepresentations relating to the purchase of the lots had been made in 1979 was the continued maintenance of the sign describing the development as a "waterfront community" and the sending of the June 16, 1981 letter. We have concluded that the sign did not constitute a misrepresentation and thus it provides no basis for a finding of fraudulent concealment. The letter, since it *disclosed* the defendants' actual intention not to build the community center, cannot be regarded as supporting a claim of *concealment*. Despite their allegations of continuing misrepresentations, the plaintiffs presented no evidence of any other conduct of the defendants relevant to the issue of fraudulent concealment that occurred after the deception that had transpired in 1979, unless mere inactivity in failing to disclose their earlier deception or their changed intentions would constitute fraudulent concealment.[4]

---

[4] The trial court did not find that the plaintiffs had proved a fraudulent concealment of the existence of a cause of action but simply assumed that the failure to disclose the falsity of the representations made in 1979 until the June 16, 1981 letter warranted the conclusion that the earlier course of action was not completed until that date. Since the court acknowledged that General Statutes § 42-110g (f) was not a two tiered unfair practices

We have held that fraudulent concealment of a cause of action under § 52-595 must, like other frauds, be proved by the more exacting standard of "clear, precise, and unequivocal" evidence. *Puro* v. *Henry,* 188 Conn. 301, 308, 449 A.2d 176 (1982); *Alaimo* v. *Royer,* 188 Conn. 36, 39, 448 A.2d 207 (1982). "To establish that the defendants had fraudulently concealed the existence of their cause of action and so had tolled the statute of limitations, the plaintiffs had the burden of proving that the defendants were aware of the facts necessary to establish this cause of action . . . and that they had intentionally concealed those facts from the plaintiffs." *Bound Brook Assn.* v. *Norwalk,* 198 Conn. 660, 665, 504 A.2d 1047, cert. denied, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986).

This court has not yet decided whether affirmative acts of concealment are always necessary to satisfy the requirements of § 52-595. Id., 665 n.10. An early formulation of the doctrine of fraudulent concealment declared, in the context of a suit for fraud, that "when the fraud has been concealed, or is of such character as to conceal itself, the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing." *Bailey* v. *Glover,* 88 U.S. (21 Wall.) 342, 349–50, 22 L. Ed. 636 (1874); see comment, "The Application of the Doctrine of Fraudulent Concealment to Modern Federal Trade Conspiracy Cases," 14 Conn. L. Rev. 115, 125–34 (1981).[5]

statute, with an alternative provision for bringing suit within a certain time after discovery of the violation, the implication of the holding is that the court believed that the defendants had a continuous duty to disclose their deception that was not fulfilled until after the plaintiffs learned of the June 16, 1981 letter.

[5] We note that in trade conspiracy cases, where the existence of the conspiracy is normally kept secret by the conspirators, the federal courts have not applied the self-concealing fraud doctrine of *Bailey* v. *Glover,* 88 U.S. (21 Wall.) 342, 22 L. Ed. 636 (1874). In such cases the federal courts have required for tolling the statute of limitations some affirmative misconduct

It is at least arguable that the representations made in the brochure concerning recreational facilities when, as found by the trial court, the defendants did not intend to construct all of them, constituted a fraud "of such character as to conceal itself." *Bailey* v. *Glover,* supra. Whether the doctrine of *Bailey* v. *Glover,* supra, should be applied to satisfy the fraudulent concealment requirements of § 52-595 in factual settings different from this case, however, we need not now decide. We are convinced that its application here would defeat the legislative intention expressed in § 42-110g (f) to bar actions for CUTPA violations after the lapse of more than three years from their occurrence. Since CUTPA violations are defined in General Statutes § 42-110b to include "deceptive acts or practices in the conduct of any trade or commerce," it is evident that the legislature intended that the perpetrators of such fraudulent practices, as well as other CUTPA violators, should be permitted to avail themselves of the statute of limitations defense provided by § 42-110g (f). Despite the existence in other states of statutes of limitation applicable to unfair trade practices establishing a limitation period for bringing an action that begins after discovery of the violation, our legislature has failed to create such an option for victims of CUTPA violations in this state. We conclude, therefore, that those who violate CUTPA by committing "deceptive acts," as the trial court found the defendants to have done, were

by the defendants designed to prevent discovery. *Hall* v. *E. I. DuPont DeNemours & Co.,* 312 F. Sup. 358 (E.D.N.Y. 1970); see *In re Fertilizer,* 1979-2 Trade Cas. ¶ 62, 894 (E.D. Wash. 1979); cf. *Crummer Co.* v. *DuPont,* 223 F.2d 238, 248–49 (5th Cir. 1955). "It is in the nature of a conspiracy that there be secrecy; mere nondisclosure or denial of the existence of a conspiracy does not constitute fraud or deceit for tolling purposes. If it did, the tolling exception to the statute of limitation [§ 4, Clayton Act, 15 U.S.C. § 15b] would eclipse the basic statute itself." *Hall* v. *E. I. DuPont DeNemours & Co.,* supra, 362.

intended by the legislature to have the same protection that § 42-110g (f) affords to other CUTPA violators, such as those who engage in "unfair methods of competition" and "unfair . . . practices in the conduct of any trade or business." General Statutes § 42-110b (a).

Our conclusion that the trial court should have found the CUTPA count to have been barred by § 42-110g (f) makes it unnecessary to consider the issue of the methodology used by the trial court in assessing damages or the sufficiency of the evidence relating thereto. It is uncertain whether the same approach to damages will be taken in further proceedings upon the remaining counts of the complaint for fraud and breach of contract. We do not believe there is any useful purpose in considering the damages issues at this stage of the litigation.

There is error, the judgment on the CUTPA count of the complaint is set aside and the case is remanded with direction to render judgment for the defendants on that count and for further proceedings on the remaining counts of the complaint.

In this opinion the other justices concurred.